Alfred G. **CINELLI,** on behalf of himself and all others similarly situated, Plaintiff–Appellant,

v.

**SECURITY PACIFIC CORPORATION; Security Pacific Corporation Supplemental Group Life Insurance Plan; Bank of America N.T. & S.A. and BankAmerica Corporation, Defendants–Appellees.**

No. 93–17318.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 15, 1995.

Decided Aug. 7, 1995.

Theodore A. Kolb and William T. Kellermann, Jr., Sullivan, Roche & Johnson, San Francisco, CA, for plaintiff-appellant.

Robert A. Gordon and Craig E. Stewart, Pillsbury, Madison & Sutro, San Francisco, CA, for defendants-appellees.

Before: SCHROEDER, BEEZER and THOMPSON, Circuit Judges.

BEEZER, Circuit Judge:

In a case arising under the Employee Retirement Income Security Act ("ERISA"), we are called upon to determine whether the termination of an insurance policy was consistent with the terms of the plan documents. In so doing we must consider what constitutes the plan documents and whether because of an ambiguity or mistake, those documents should be reformed.

Alfred Cinelli appeals the district court's grant of summary judgment in favor of Security Pacific Corporation Supplemental Group Life Insurance Plan ("the Supplemental Plan"), Security Pacific Corporation ("Security Pacific"), Bank of America N.T. & S.A. and BankAmerica Corporation ("BankAmerica"). Cinelli argues that the Supplemental Plan was improperly terminated depriving him of fully vested life insurance benefits. The district court found that the benefits

were not fully vested and that the Supplemental Plan provided for termination. We have jurisdiction pursuant to 28 U.S.C. § 1291. We conclude the termination of the Plan was consistent with the plan documents and we affirm.

### I

Security Pacific offered a group life insurance plan to all of its employees. In 1979, the Board of Directors decided to offer a supplemental life insurance plan to its senior management. The Board adopted a resolution authorizing the company to enter into a contract with Aetna Life & Casualty Company ("Aetna") to provide the insurance policy. According to the resolution, Security Pacific would pay the premiums on the policy and make it available to senior officers. Participation in the supplemental life insurance plan would be voluntary and would continue upon retirement. The resolution provided that "50% of the value of the benefit will vest at age 55, increasing 10% annually, with full vesting at age 60."

The resolution further provided, "[t]he Corporation shall enter into an agreement with Aetna Life & Casualty Company which shall constitute the Supplemental Group Life Insurance Plan." Security Pacific obtained a rider to the existing Aetna life insurance policy. The policy between Aetna and Security Pacific provided that Security Pacific could terminate the policy at any time and that coverage would terminate upon discontinuance of the policy. The policy rider establishing the Supplemental Plan did not include any vesting language or termination provisions.

Cinelli, a senior vice president with Security Pacific was informed of his eligibility for the supplemental life insurance and became a participant in 1979. He received a letter from Richard J. Flamson, Security Pacific's president, informing him that he was eligible to participate and that his coverage under the plan would be $100,000. The letter also contained the vesting language contained in the Board's resolution.

Cinelli retired from Security Pacific in 1981 at age 66. At the time of his retirement he was entitled to approximately $40,000 in life insurance coverage under the Basic Life Insurance Plan and $100,000 under the Supplemental Plan.

In 1992, BankAmerica merged with Security Pacific. BankAmerica became the successor sponsor of the Supplemental Plan and assumed all liabilities under the Supplemental Plan. BankAmerica also became the policy holder under the Aetna policy. BankAmerica notified the Supplemental Plan participants that it intended to terminate the Supplemental Plan effective December, 31, 1992. At the time of the termination notice, BankAmerica notified the participants that the coverage could be converted to a new policy without medical examination. Upon conversion the participants were required to pay the premiums. At the time of the conversion offer Cinelli was 78 years old. BankAmerica then informed Cinelli that 67% of the coverage would continue through June 30, 1993, with premiums to be paid by the company. The 67% would then be convertible to a participant paid policy. The remaining 33% could be immediately converted into a policy available through Aetna with premiums to be paid by the participant.

Cinelli did not convert his policy and his insurance terminated. Cinelli believed that based on his age comparable insurance was not available, and if available, economically infeasible.

Cinelli filed this action, on behalf of himself and all others similarly situated, to recover under the Supplemental Plan. The district court concluded that the Board resolution was not part of the Supplemental Plan documents. The district court then concluded that the Supplemental Plan, i.e., the Aetna policy and rider, provided for termination and granted summary judgment in favor of the Supplemental Plan. Because the district court concluded that BankAmerica properly terminated the coverage under the Supplemental Plan, the court also granted summary judgment in favor of BankAmerica on Cinelli's claim for breach of fiduciary duty.

### II

We review de novo the grant of summary judgment. *Jesinger v. Nevada*

*Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). The district court's decision is reviewed in the light most favorable to the nonmoving party to determine whether any dispute of material fact exists and whether the district court properly applied applicable law. *Id.*

## III

■ A plan that provides benefits in the event of death is a "welfare plan" under ERISA. 29 U.S.C. § 1002(1). Unlike pension plans, welfare plans are not subject to the vesting requirements of ERISA. 29 U.S.C. § 1051(1). Because benefits under a welfare plan are generally neither vested nor accrued, an employer may amend or terminate benefits pursuant to the terms of the plan at any time. *See Serrato v. John Hancock Life Ins. Co.,* 31 F.3d 882, 884 (9th Cir.1994); *Joanou v. Coca–Cola Co.,* 26 F.3d 96, 98 (9th Cir.1994). It is accepted, however, that "the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated." *Hansen v. White Motor Corp. (In re White Farm Equip. Co.),* 788 F.2d 1186, 1193 (6th Cir.1986). *See also Gable v. Sweetheart Cup Co.,* 35 F.3d 851, 855 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1442, 131 L.Ed.2d 321 (1995); *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993). A contractual agreement for vesting of benefits must be found in the plan documents. *Wise,* 986 F.2d at 937 ("Such extra-ERISA commitments must be found in the plan documents and must be stated in clear and express language."); *Gable,* 35 F.3d at 855.

The Security Pacific Board resolution provides that the benefits under the Supplemental Plan would fully vest at age 60. The Aetna policy and rider, or the purported Supplemental Plan, includes no vesting language and instead provides that the policy is terminable by the employer at any time. We consider whether the Board Resolution is part of the plan documents so that the Supplemental Plan has contractually agreed to vested benefits. If not, we then consider whether the Supplemental Plan is sufficiently ambiguous as to vesting or termination to allow consideration of documents outside the Supplemental Plan.

### A

■ Although it is clear that an insurance policy may constitute the "written instrument" of an ERISA plan, *see Musto v. American General Corp.,* 861 F.2d 897, 900–01 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989), Cinelli argues that the Board resolution is also a plan document and part of the Supplemental Plan. The resolution provides, however,

> The Corporation shall enter into an agreement with the Aetna Life & Casualty Company which shall constitute the Supplemental Group Life Insurance Plan.

The resolution also states,

> That said recommendation for the creation of the Supplemental Group Life Insurance Plan, be, and the same hereby is, approved.

Although the resolution contains terms of the Supplemental Plan, the resolution purports to be a recommendation and approval for the creation of the Supplemental Plan. The resolution also specifically provides that the Aetna policy would constitute the Supplemental Plan.

We complied with a strict statutory construction of plan documents in *Watkins v. Westinghouse Hanford Co.,* 12 F.3d 1517 (9th Cir.1993). In *Watkins,* the employee argued that letters from the company created a plan document and were binding on the employer. We disagreed, concluding that "the letters . . . contain none of the details about beneficiaries, source of financing, or procedures for paying and administering benefits that are necessary to create an ERISA plan." *Id.* at 1523 (footnote omitted). We recognized that plans must be maintained pursuant to a written instrument. *Id.* at 1523 n. 1; 29 U.S.C. § 1102(a)(1). "Each such plan must (1) provide a policy and a method for funding the plan, (2) describe a procedure for plan operation and administration, (3) provide a procedure for amending the plan, and (4) specify a basis for payments to and from the plan."

*Watkins,* 12 F.3d at 1523 n. 1; 29 U.S.C. § 1102(b). Because the letters at issue in Watkins did not contain the sufficient information to qualify as plan documents, we concluded that they could not establish an ERISA plan. We noted that "it is the reality of the plan, fund or program and not the decision to extend certain benefits that is determinative." *Id.* at 1523 (internal quotations and citations omitted).

■ Cinelli first argues that the Security Pacific Board Resolution and the Flamson letter were plan documents under ERISA sufficient to create the Supplemental Plan. The Flamson letter contained no information on amendment procedures nor did it describe a procedure for plan operation and administration. The same can be said of the Board Resolution. Because the documents were insufficient to establish an ERISA plan, the Supplemental Plan was not established until the policy rider was obtained from Aetna. Only the policy to which the rider was attached met the requirements under the statute to create an ERISA plan.

■ Cinelli argues that *Horn v. Berdon, Inc. Defined Ben. Pension Plan,* 938 F.2d 125 (9th Cir.1991) establishes that a Board resolution is sufficient to establish ERISA plan terms. Cinelli's reliance on *Horn* is misguided. In *Horn,* the beneficiaries under a pension plan brought an action under ERISA to recover surplus benefits distributed to the employer after the termination of the plan. At termination of a plan, the employer may distribute surplus assets to the corporation if the plan so provides. We noted, however, that prior to the termination of the plan, the board of directors had adopted a resolution that the assets of the plan would be distributed to the beneficiaries. Although the board resolution was not titled as an amendment to the plan, in effect it did indeed amend the plan. We concluded that the Board had the power to amend the plan and therefore the resolution amended the plan to require that surplus assets be distributed to the beneficiaries. We decided that because ERISA only requires the plan be maintained by a "written instrument," "[n]o additional formalities are required." *Id.* at 127.

■ The Board resolution in this case is markedly different from *Horn.* The Security Pacific resolution did not undertake to amend the plan, but rather to authorize the creation of a new plan. On its face, the resolution provided that the Supplemental Plan would be the Aetna policy. Unlike *Horn,* where we concluded that the resolution was an amendment because it complied with all the requirements for an amendment, regardless of what is was labeled, the same can not be said of the resolution in this case. Even if we were to assume that the Security Pacific Board resolution complied with all amending procedures as in *Horn,* the distinction remains that the resolution contained no amending language. The Security Pacific resolution authorized the creation of the Supplemental Life Insurance Plan. It did not modify or terminate the current benefits under the Group Life Insurance Policy. It called for the creation of a new Supplemental Plan. The resolution was not an amendment, nor a plan document, but rather an enabling document.

Cinelli also argues that the resolution or the letter created an informal, yet binding, ERISA plan which contained the pertinent vesting language under the analysis of *Donovan v. Dillingham,* 688 F.2d 1367 (11th Cir. 1982) (en banc). In *Donovan,* the Eleventh Circuit examined the circumstances that could establish a welfare plan and concluded,

> In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.

*Id.* at 1373. The *Donovan* court also recognized, however, that

> A decision to extend benefits is not the establishment of a plan or program. Acts or events that record, exemplify or implement the decision will be direct or circumstantial evidence that the decision has become reality . . . assuring employees that a plan or program exists [for example]—but it is the reality of a plan, fund or program and not the decision to extend certain benefits that is determinative.

*Donovan,* 688 F.2d at 1373. In *Williams v. Wright,* 927 F.2d 1540 (11th Cir.1991), the Eleventh Circuit applied the *Donovan* analysis and concluded a plan was created based on a letter from the company president that outlined the source of financing, the details of beneficiaries and procedures for paying and administering benefits.

We considered the *Donovan* analysis in *Scott v. Gulf Oil Corp.,* 754 F.2d 1499 (9th Cir.1985). We concluded, applying the *Donovan* analysis, that allegations in the complaint that an employer orally agreed to provide benefits could create a plan under *Donovan* and stated an ERISA claim. *See also Modzelewski v. Resolution Trust Corp.,* 14 F.3d 1374, 1376–77 (9th Cir.1994) (concluding an employment contract sufficiently contained the required elements set out in *Scott* ). In *Watkins,* we again considered the *Donovan* analysis. 15 F.3d at 1522. We addressed the question whether preliminary summary booklets and subsequent correspondence established an ERISA plan. We concluded that the letters did not contain the necessary information required to create an ERISA plan in accordance with the statute. *Id.* Rather, we again concluded that the intent to create a plan is not enough. *Id.* at 1523. *See also Carver v. Westinghouse Hanford Co.,* 951 F.2d 1083, 1087 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992).

In *Elmore v. Cone Mills Corp.,* 23 F.3d 855 (4th Cir.1994) (en banc), the Fourth Circuit considered whether pre-plan promises created a fiduciary obligation or gave rise to a binding informal plan. In the course of a takeover bid, management made promises to employees regarding benefits and the terms of an Employee Stock Option Plan ("ESOP"). Those promises were made in a letter from the company's Chairman of the Board and Chief Executive Officer to the employees. The ultimate ESOP that was adopted did not contain the terms for the disposition of the surplus set out in the letter. The district court concluded that the letter was a part of the plan because it made a "promise of benefits" that was "formal, authorized, and rati-

fied." *Id.* at 860. Because the district court found that the letter was part of the plan, it concluded that the Board violated its fiduciary duty to comply with the plan documents. The district court also made the alternative ruling that subject to the proof of detrimental reliance, the beneficiaries could recover on a theory of equitable estoppel. *Id.* at 858.

The Fourth Circuit first concluded that the documents did not create a formal plan under ERISA. The court determined that the documents were not amendments of the formal plan because the letter did not comply with the amendment procedures of the plan. Turning to the question whether the letters created a binding informal ERISA plan, the court considered *Donovan* and *Carver,* 951 F.2d at 1086 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992), and determined that they did not. The court examined the *Donovan* criteria and concluded that the correspondence at issue did not create an ERISA plan. The court concluded that the letter contained no provisions for the procedures for receiving benefits, which could only be ascertained from the plan itself. The court also concluded that where the employer actually adopted a plan, the preliminary statements regarding the plan are not enforceable as an employee benefit plan. *Elmore,* 23 F.3d at 862. Citing *Carver,* the court concluded that "*Donovan* and its progeny only apply when the surrounding circumstances demonstrate the creation of a de facto pension plan." *Id.* at 862. Where a plan was later adopted, the preliminary communications did not create an informal ERISA plan.[1] *Id.*

Although Cinelli argues that the resolution and the letter from the president informing him of the plan satisfied the requirements of *Scott* and *Donovan* and created a plan under ERISA, *Donovan* is limited to instances where a formal plan is absent and the question remains whether a de facto plan has been created. *Carver,* 951 F.2d at 1086. In this instance, the Board adopted a formal plan and the formal plan did not contain the vesting language of the resolution. In light of the subsequent adoption by the Board of

---

1. Although the Fourth Circuit concluded that the correspondence was not part of the plan documents, the court was equally divided on the theory of equitable estoppel.

the formal plan, the letter and resolution did not create an informal, yet binding ERISA plan. *See Elmore,* 23 F.3d at 862 (concluding that a preliminary letter was not binding where it did not meet the requirements of *Donovan and* where the formal plan was subsequently adopted). The Resolution only reflected the Board's decision to create a plan providing the supplemental life insurance benefits. It was the Aetna policy and its rider that implemented the Supplemental Plan and constitutes the Supplemental Plan.

## B

■ Because the Board Resolution is not a plan document, a consideration of the language of the resolution is precluded unless the terms of the Supplemental Plan are ambiguous as to termination. We conclude that the Supplemental Plan clearly provides for its termination.

The policy contains both termination and discontinuation of benefits provisions that provide for the termination of the Plan and benefits to the employees. The policy provides that "All insurance of any employee under this policy shall terminate ... [u]pon discontinuance of the policy." Further, "the Policyholder may discontinue this policy with respect to all employees of any one or more Participant Employers, and any Participant Employer may discontinue this policy with respect to all employees of such Employer, by giving to the Insurance Company written notice stating when, after the date of such notice, such discontinuance shall become effective." The effect of those clauses is to allow the employer to terminate the Supplemental Plan at any time with the proper notice. The policy also contains an integration clause. The termination provisions of the policy are unambiguous as to the company's right to terminate the policy at will. Absent an ambiguity in the Supplemental Plan, we will not consider the resolution to alter or modify the terms of the Plan.[2]

The provisions of the policy, or Supplemental Plan, are clear that the employer may terminate the Supplemental Plan at any time. Because the Plan contains no ambiguity as to the employer's right to terminate the Supplemental Plan, extrinsic evidence may not be used to alter the written terms of the plan.

## IV

■ Cinelli also urges us to remand because a material question of fact exists as to whether the failure to include the vesting language was a mistake. Cinelli argues that because the writing does not reflect the intent of the parties due to mistake, parol evidence is admissible to establish the true agreement between the parties. *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1295 (6th Cir.1991) (allowing extrinsic evidence to examine the intent of a collective bargaining agreement containing ERISA plan).

■ We recognize that ERISA generally preempts common law theories of contract law. *See Dockray v. Phelps Dodge Corp.,* 801 F.2d 1149, 1155 (9th Cir.1986) (citation omitted). We have allowed exceptions where the application of general contract principles is not inconsistent with the purposes of ERISA. For example, we permit equitable estoppel principles to apply in limited circumstances. Consistent with ERISA's strong preference for the written plan, we do not allow an estoppel claim to lie where it would contradict the written terms of the plan. *Watkins,* 12 F.3d at 1527.

Other circuits have allowed the limited use of mistake to examine the intent of parties in ERISA cases. In *Armistead,* the Sixth Circuit permitted the admission of parol evidence based on a theory of mistake in the context of a collective bargaining agreement which also contained an ERISA plan. *Id.* at 1295. The court recognized, however, that "collective bargaining agreements are gov-

---

2. Cinelli's argument that the termination provision of the Supplemental Plan is ambiguous because it is not contained in the rider is without merit. The rider specifically provides that it is "Attached to and Made a Part of the Group Policy." Furthermore, the policy itself, under "Article II—Benefits," provides the Supplemen-
tal Life Insurance Coverage. The rider was incorporated into the benefits portion of the policy and is governed by the terms and conditions of the policy itself. The termination and discontinuation provisions of the policy contain no ambiguity and allow BankAmerica to cancel the policy.

erned by traditional rules of contract interpretation as long as their application is not inconsistent with federal labor policy." *Id.* at 1293. The Seventh Circuit also permitted a limited version of a mutual mistake theory in the ERISA context. *Miller v. Taylor Insulation Co.,* 39 F.3d 755 (7th Cir.1994). The court allowed consideration of the parties intent where there was a "latent ambiguity in the contract." *Id.* at 760 (comparing it to the "famous case of the two ships named *Peerless*"). In *Ramsey v. Colonial Life Ins. Co. of America,* 12 F.3d 472, 479–80 (5th Cir. 1994), the Fifth Circuit came to a similar conclusion where it voided a conversion insurance policy governed by ERISA where both parties were mistaken as to the need for a conversion policy. The court concluded that "[w]here both parties to a contract are mistaken as to a material aspect of the contract, a court can reform or void the parties' obligations under that document." *Id.* at 479. Finally, the Third Circuit relied on "scrivener's error" in the ERISA context to allow the examination of parol evidence as to the parties' intent. *International Union v. Murata Erie North Amer.,* 980 F.2d 889, 907 (3d Cir.1992). The court examined the purposes and policy of ERISA and concluded that reformation for a "scrivener's error" was permissible because the result was a windfall to either party, an excess neither party could have expected. *Id.* ERISA's goal of providing clear plan documents was not implicated where neither party could have foreseen the excess or determined its disposition from the plan documents. *Id.*

Unlike *Armistead, Ramsey* and *Miller,* this case involves neither a collective bargaining agreement with an ERISA plan, nor a mutual mistake as to a material aspect of the contract or a "latent ambiguity." Rather, we must consider whether the application of the principles of mistake to this case would be consistent with the principles of ERISA stated above.

We conclude that in this case the application of the principles of mistake would be inconsistent with ERISA's strong preference for the written terms of the plan and the goal of ERISA to ensure that an employee's rights and obligations can be readily ascer-

tained from the plan documents. In this instance the consideration of parol evidence as to the intent of the Board would be used to alter the unambiguous written terms of a formal plan document. Furthermore, unlike *Murata* where the application of scrivener's error was permissible since the error at issue was a windfall and would not mislead the employee as to benefits, Cinelli seeks to establish a mistake as to a fundamental provision of the plan documents. Those documents contain a clear statement of benefits and it would be inconsistent with the goal of ERISA to allow either the employee or employer to attack that statement on the basis of mistake. We decline to apply the doctrine of mistake in this instance to consider the intent of the parties.

## V

Cinelli claims breach of fiduciary duty pursuant to 29 U.S.C. § 1132. The district court dismissed the claim finding no breach of fiduciary duty where BankAmerica's termination of the plan was a business decision and in accordance with the terms of the Supplemental Plan.

We recently clarified that 29 U.S.C. § 1109 governing liability for breach of fiduciary obligations under ERISA only allows recovery for injury to the plan itself. *Farr v. US West,* 58 F.3d 1361, 1364 (9th Cir.1995). Individual beneficiaries may bring fiduciary actions against the plan fiduciaries, but they must do so for the benefit of the plan and not their individual benefit. *Id.* (citing *Parker v. BankAmerica Corp.,* 50 F.3d 757, 768 (9th Cir.1995)). Cinelli's action is for benefits for himself and other individuals similarly situated, not for injury to the Plan. The district court's dismissal of the claim was proper.

## VI

The appellees seek attorney fees on appeal pursuant to 29 U.S.C. § 1132(g). Section 1132(g) provides in part, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." We consider the following factors in determining whether to award attorney fees:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Franklin v. Thornton,* 983 F.2d 939, 943 (9th Cir.1993) (quoting *Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446, 453 (9th Cir.1980)). Cinelli's claims were not made in bad faith and were supported by a good faith argument to extend the law of this circuit. *See DeVoll v. Burdick Painting,* 35 F.3d 408, 414 (9th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1381, 131 L.Ed.2d 234 (1995). We decline to award fees or costs pursuant to section 1132(g).

AFFIRMED.